I'm advised by the clerk that everyone who should be present is present, so we'll begin with the first case. That is United States v. Thompson. Thank you. Good morning, Your Honors. Matt Larson of the Federal Defenders for Mr. Thompson. Your Honors, Section 1591 substantially infringes the First Amendment rights of expressive and family association, and it is not a narrowly tailored or the least restrictive way of combating sex trafficking. The statute fails strict scrutiny, and the district judge was correct to observe that it is indeed, quote, poorly drawn. The judge's mistake was ignoring the plain text of the statute and looking instead to the legislative history. Well, where does the statute address expressive activity? What part of the statute does that? The verbs that we've focused on, Your Honor, are the verbs harbor, transport, or maintain by any means. The by any means is an important qualifier. So that may suggest that there are applications of the statute that may affect expressive activity, but are most of the cases that you've cited not cases where expressive activity is more directly at issue in the statute? There may be some cases where it's pure speech. There may be some cases where there's also expressive conduct. As we explain, this statute criminalizes both pure speech and expressive conduct, as well as family association. It criminalizes pure speech in this way. The statute says, anyone who maintains by any means someone engaged in the trade. A therapist who maintains— To say to someone, I sympathize with you in your plight, and I think that engaging in sex work is pretty much the best alternative you've got, so thank you for your service. Is maintaining that person? No. We're not talking about people who make a casual remark like that. Today, we come to you in the shoes of organizations like GEMS. Because of the exception to the normal standing requirement, Mr. Thompson is able to make a facial over-breath challenge to this statute. And when he does so, he stands in the shoes of groups like GEMS, Girls Education and Mentoring Services, organizations which exist exclusively to aid young girls and women who are engaged in the sex trade and trying to leave that trade. When they— Why if you are trying to assist young women to escape the sex trade, are you maintaining them in their present activity? And I understand that there's not a mens rea requirement that requires that you intend to promote their activities in the sex trade. But it seems quite a stretch, doesn't it, to say that—I mean, why do they even know that the person is going to continue in the sex trade? They're trying to help them out of it. A perfect example of this is M1 in this very case, Your Honor. M1 during the events of this case resided at the Gateways Program, which is a housing program provided by the Jewish Child Care Association, which houses women and young women who are trying to leave the sex trade. Now remember that the statute doesn't say you necessarily have to know that the person will engage. It also has an element of reckless disregard. And in the context of this effort— Why would you think it's reckless—the very fact that someone is coming to this kind of service rather than residing with someone like Mr. Thompson, doesn't that suggest that the person—that the people operating the service anticipate that this is someone who's trying to get out? As these organizations well know and express on their website, among other sources, the For a lot of these young women, it's an arduous process to leave the sex trade. And these organizations exist— These are interesting hypotheticals, and I understand your argument, well put, that there is a certain level, some overlap. But what I missed was any substantial overlap. I saw a little bit of overlap, but the test is whether there's substantial. Well, just so I understand Your Honor's question, the test is whether the infringement on the First Amendment right is substantial, both in itself and as compared to the legitimate sweep of the statute. So here we explain in our briefs how the infringement is substantial indeed. Organizations like GEMS face the choice of essentially closing their doors or complying with this statute. None of them have closed down, I take it, in fear of this statute. And as Your Honor is well aware, whether they've actually closed or whether the government has actually brought a process— Well, you're telling us that they face this stark choice of they can stop doing what they're doing or they can risk imprisonment. And I see them continuing to engage in their activities and no real risk of prosecution. Just as in the Stevens case, Your Honor, hunting organizations and hunting periodicals continue to put out— But that's a perfect example of a case where the statute directly addresses expressive activity. It says, we're going to stamp out this kind of expressive activity, and it turns out that the kind of expressive activity went way, at least on the literal meaning of the statute, went way beyond what Congress was focused on. But that was directly aimed at expressive activity. Your Honor is correct. And as Your Honor also is aware, the court, the Supreme Court has not given a narrow reading to the First Amendment. It's not just pure speech that's protected. And we cite the cases in our brief. Well, well, well, no, but when I'm talking about pure speech, this is not a question of are you saying I'm opposed to the war in Afghanistan or are you out in the streets walking up and down with a sign. That's not the issue. The question is, is the statute, a statute that directly prohibits certain kinds of speech or expressive conduct, expressive conduct that targets the expressive aspect of what's going on and then is overbroad so that it applies as well to protected speech is a rather different thing than a statute that directly aims at activity that is not at all expressive. Putting money in the pockets of people in the sex trade is not a First Amendment protected activity. The activity of these organizations, Your Honor, is expressive because they express the viewpoint that the individuals they're trying to help are not criminals, which is Congress actually went after them. Suppose Congress passed a statute that said, we think that the activities of these organizations are actually furthering illegal activity, and we want to put a stop to it. Would that be unconstitutional as a violation of the First Amendment to prohibit people from maintaining and harboring people who are engaged in the sex trade? If there's no criminal intent and if the... Wait, wait. What criminal intent are we talking about? Criminal intent to further the sex trade. And here we all agree that these organizations, these families that are trying to extract their relatives in the trade, do not want to further the trade. But in the course of trying to extract them, they maintain by any means. Right. Can't Congress prohibit activity that Congress thinks furthers the sex trade, even if the people who are engaging in those activities think that they're doing good? And the answer in this case is no, because the analysis that applies to an infringement of the First Amendment rights that we're talking about here is strict scrutiny. Congress may, of course, regulate... I guess I'm still having trouble understanding why it's strict scrutiny. I can believe that the marijuana laws should be repealed. I can express that view as much as I like, but I can't express it by providing money to people who are engaged in the marijuana trade, knowing that that's what they're using the money for. Indeed. And in this context, the support that's provided for the women who are trying to leave the trade, the expressive component of what these organizations do and what these families do is at the heart of the expressive rights that the First Amendment protects. When there is a substantial infringement, the law must be narrowly tailored. The problem with this law is that it does not target actual sex offenders only. But you've just said that also when there's a substantial infringement, that's part of what I think Judge Parker was aiming at. You need to show that the infringement, both on intimate associational rights and organizational rights, is substantial in relation to the plainly legitimate sweep of the statute. The statute has a very plain and very broad legitimate sweep. I don't understand why you think you may have carried your burden to show that there's a substantial burden in this respect, given the kind of activities that are not expressive and that Judge Lynch is focused on. Could you address that, please? Indeed, with regard to the sweep, we've identified in our briefing, and the government doesn't dispute, that relatively speaking, the number of actual sex traffickers caught up by 1591 is comparably small to the scores of mothers, fathers, sisters, brothers, therapists, social workers, religious and lay advocates. You're saying this based on what? Based on the number of organizations that we identified in the district court and in our briefs here that exist to aid trafficked women and girls. More people in organizations attempting to aid trafficked women than there are pimps in the world? Than there are caught by the statute. Because remember, this statute, Your Honor, does not actually criminalize. There's no sex act required by the statute. This statute does a much broader sweep than actual provision of an individual for a consummated sex act. I take it the record does not reflect the existence of any organization that believes its functioning is impaired by this statute? Your Honor. These extracting organizations. Your Honor, by the plain text of the statute, an organization like GEMS is in violation of 1591. Whether the government actually ... I was asking you a slightly different question. I get your point, but I just wanted to confirm that there's nothing in the record that shows any organization like GEMS woke up in the middle of the night worrying about this statute? We have no such evidence in the record. This court is within its discretion to seek it. Certainly in the Stevens case, the court received amicus briefs from the NRA explaining how it felt that the statute at issue there reached hunting periodicals and was overbrought in violation of the First Amendment. If this court would like such record evidence, it's within its discretion to stay decision until such record evidence is proffered, which we can certainly provide. Let us think about that. Okay. Thank you, Mr. Larson. You have ... Before you go, I just want to ask a technical question. I noticed that in your reply brief, you not only do not return to the Blockberger argument, but the relief requested conspicuously omits the request that we vacate the convictions under the overlapping counts, which you said in your main brief. Does that suggest that you have abandoned that argument, the Blockberger argument? Yes, Judge. We say on the first page of our reply brief that we withdraw those arguments. Okay. Thank you. Thank you very much. You have two minutes for rebuttal. We'll hear from the government. Thank you. Good morning, Your Honors. Matthew Jacobs for the United States. I tried the case before Judge Glasser, along with AUSA Jennifer Sasso, who's present at counsel's table. I'd first like to note that 1591 does not criminalize innocent conduct. And appellant's interpretation of the relevant language, harbor transport, maintained, is simply too broad. Judge Glasser rejected it for that reason. This Court should, too. I think one of the major flaws in appellant's interpretation . . . Right. . . . . is that it's not quite open-ended to maintain, provide, harbor by any means. Right? I mean, it does have a scienter requirement, but those verbs could encompass a broad range of conduct, couldn't they? Yes, I'd agree with that, and I would agree with Judge Glasser that the statute could have been drafted better. But when the words of the statute are read in context and not in isolation, as appellant does, the purpose of the statute becomes completely clear. I think the appellant ignores, for example, the words that appear, the verbs that appear before harbor, maintain, and transport, like entice and recruit. He ignores the title of the statute, which is sex trafficking of children or by force, fraud, or coercion. He ignores the chapter in which the statute appears, titled peonage, slavery, and trafficking in persons. But those aren't substantive provisions. Those are just rubrics. Correct, Your Honor. I mean, our law is quite clear that you really can't take much from them. Correct. But as the Supreme Court said, as recently as 2015 in Yates, when interpreting words in a statute, you have to look at the context, like the other words in the substance of the statute, entice and recruit, and their place in the statutory scheme as a whole. I think that appellant's interpretation would lead to utterly . . . Isn't your best argument simply that the adverse effects on innocent organizations are tangential and speculative, and the overlap is simply not substantial? Your textual argument seems to me to be digging a hole you don't need to go into. I don't disagree with that, Your Honor. And I think that it's perfectly clear that 1591 is not overbroad relative to its legitimate sweep or in an absolute sense. And I want to note a few things that the Supreme Court has said, that an appellant who bears the burden of showing overbreath must show that overbreath from the text and from actual facts. He must show that there's a realistic danger that the statute will significantly compromise recognized First Amendment protections. And I think the contrast with Stevens is clear. In that case, there was certainly a realistic danger that hunting organizations would be in trouble. I can see a television executive saying, you know, I don't know if we can air this show because it depicts wounding and killing of animals. And in fact, as the appellant noted, the NRA filed an amicus brief here. I can't imagine a situation where any of the organizations, GEMS, Gateway, that exist to protect victims of Alvon Thompson would be filing an amicus brief on behalf of him in this case. And as Your Honor noted, too, it's critical to note that 1591 does not regulate speech. So you're not suggesting that we test that proposition by inviting them to file an amicus brief, are you? Certainly not, Your Honor. Because I can imagine just about anything in terms of an organization's perceived self-interests. The main point is they have not come into court in this case. I appreciate that clarification. Although, a social worker from Gateways did testify as a witness for the government. And actually, to your point earlier, I believe you asked, how would a woman like that or a person like that know that the victim is going to be brought, going to be returned to that lifestyle? There's no way she would have. Because the purpose of these organizations is to extract minor victims from the clutches of people like Alvon Thompson. They can't be said to know that they'll return there. If they do their job, they're hoping they don't. So you're saying knowing that she has been, he or she has been coerced to engage in a sex act? I'm sorry, I didn't— Doesn't the statute, the mens rea, refer to knowing that the person harbored has been coerced? Am I mistaken about that? I believe it will be used to cause the person to engage in a commercial sex act. Okay. Um, you know, I'd like to note that to the extent the statute could conceivably sweep up legitimate activities, and I don't think it can, then an as-applied constitutional challenge or case-by-case adjudication would be the proper remedy. Would we be entitled, though, to sever, for example, to just delete the word harbor or the statutes and holding that the rest had the legitimate sweep, but this was too susceptible to an overbroad application to survive? Is that something we could consider? Well, I think severance would be better than validation, but I don't think it's proper in this case because, as Judge Glasser noted, taken in context, the words of the statute clearly refer to the act of sex trafficking. Harbor has been interpreted in the immigration laws, for example, in ways that I'm not sure would transfer here in a way that would support the defendant. Title VIII, United States Code Section 1324 criminalizes harboring of illegal aliens, and I think that's different than the harboring appellant contemplates here that an organization like GEMS or Gateways would do. You wouldn't say, you know, mom and dad are out because grandma and grandpa are harboring the kids for the weekend. There are uses of harboring, harboring fugitives, harboring illegal aliens, harboring victims of sex trafficking, and especially when read in context, I think that word can't be defined as broad. The word harbor is a little different than the word house. Correct, Your Honor. Or provide shelter to or something like that. At least that word, I should think, entails some kind of intent to further the person's activities. Yeah, I think that's absolutely correct, especially when read right after entice and recruit in light of the statute as a whole. Explain to me why you think venue is proper in the Eastern District. I mean, the filming took place in the Bronx. Yes, Your Honor. The filming of the pornographic video took place in a Bronx hotel room, but the offense began and continued for a long period of time in Brooklyn, in the Eastern District. The defendant's MO was to persuade, entice, coerce through violence, verbal threats, professions of love, these minor victims. Suppose they started off in Florida and drove to the Bronx, and he's mouthing with her the whole time about coercing her. Does that mean that venue is proper in every state they drove through? You're supposed to say yes to that. Yes, Your Honor. If they drove across country? Yes. And he's at her the whole time about, we're going to make this photograph, we're going to make this movie. Your answer to that, it seems to me, makes the venue provision totally meaningless. I disagree with that respectfully, Your Honor, because the crime includes the coercion and the persuasion. So if that happens in a particular state, then venue is proper there because the federal government has an interest. South Dakota? So it seems to me the easy case for you is in Brooklyn, or indeed in South Dakota, the defendant holds a gun to the victim's head and says, come with me to the Bronx, we're going to make a movie. Right? That would be the easy case for you. Yes, Your Honor. Because then clearly one element of the offense, because the offense isn't just making the movie, the offense is coercing someone to make a movie, would have taken place in that other venue. Your case here is one notch harder than that, isn't it? Because what you're saying, he didn't, as far as we know, there's no evidence that he said in Brooklyn, come to the Bronx with me and we're going to make a movie. It's that he's continually coercing her to do whatever he asks her to do. And then when they get to the Bronx, one of the things he asks her to do is to make the movie. I would clarify that in one way, Judge. There's a mountain of evidence that went to the jury in this case that the defendant trafficked these girls for multiple reasons. One, to have sex with them. Two, to film that sex, to document his pimp status, to take lewd photos and post them in these back page prostitution ads. And for his own gratification, to watch these. So a little, it's half a notch. It's in between the case I posited of come to the Bronx and make a movie and the case where he generally coerces her to do whatever he asks. He had coerced her to take pictures in Brooklyn. But this particular picture taking that is the subject of this particular count was not specifically, as far as the evidence shows, coerced in some other district. And I take it what you're saying is the standard for venue is preponderance of the evidence and the jury could reasonably infer that if he is coercing her to make films in Brooklyn or take pic photographs in Brooklyn, if he is coercing her to do whatever he wants, and then one day when they're in the Bronx, what he wants is to make this particular movie, that that's enough that the jury could infer by a preponderance that coercion took place in the Eastern District. Yes. I don't think I could say it better than that. I don't think so either. Thank you. Thank you very much. Mr. Larson, you have two minutes for rebuttal. Thank you, Your Honors. On this venue point of count five, count five was pure overreach. There was no evidence that the coercion to create the video happened anywhere but in the Bronx hotel room. And I think we set out the evidence. There could have been enticement as well, right? I mean, there were various elements of conduct that occurred prior to the actual filming. Yes, Judge. If there had been evidence of Mr. Thompson calling her, coming to the Bronx, texting her, any evidence of physically transporting her, I wouldn't have made this argument. I made this argument because there's no evidence that he coerced her in the Bronx. You don't object to how the jury was instructed on the point, though, right? I object to the government's argument, which is that over this two-year span, we'll have this general sort of coercion standing in for actual evidence. This Court has interpreted the statute, 2251, as saying that if there's going to be a recorded sex act, it cannot be an incident of the conduct. Here, it was an incident. The conduct generally was terrible, but it concerned other things. It did not concern the creation of a recorded image. When you talk about the venue statutes, I mean, look at what we've done with mail fraud. Pretty much anything you do in connection with a scheme to defraud. The exact things that Judge Parker was talking about, we've countenanced repeatedly. Any place where the slightest activity in furtherance of the scheme takes place as possible venue. On top of that, if you mail the letter and it goes, you mail a letter in California and someone drives it by truck across the country. Indeed, in obscenity statutes, it's been interpreted that if you mail an obscene film from Nashville to Los Angeles or vice versa, you can posit the venue anywhere the defense counsel told me one day that the Second Circuit's law now is that if you tell a lie, when you're walking past a mailed box, it's . . . Probably another example of overreach, Judge, but I think the question, Your Honor, is whether the conduct constituting the offense occurred in the Eastern District. Here, the conduct constituting the offense was causing the young woman to engage in a recorded sex act. That happened in a Bronx hotel room. To return finally to this last point, I'm sensing it may be . . . Suppose he had explicitly said to her at some point in Brooklyn with a gun to her head, you will do whatever I want or I will come after you and kill you. And then, X period later, they're in the Bronx and he says, here's what I want you to do today. That wouldn't be good enough to place the venue in Brooklyn as well as in the Southern District. I recognize, and indeed I once won a case in this courtroom on the theory that venue should have been in the Southern rather than the Eastern District of New York. But you can see the courthouse from this very window in the Eastern District. We're not exactly talking about oppressive venue conditions. Indeed, it's not beyond a reasonable doubt, but it has to be more than likely. And all the evidence showed here was that the coercion to create the recorded sex act occurred in the Bronx, not in Brooklyn. You're saying the coercion. First of all, my hypothetical was, what if there was explicit coercion not to make a video, but to do whatever I instruct you to do? If we had that fact pattern, I would have to say that's too broad a threat to lay venue for a specific offense. Broxmire is the case that this Court decided saying for 2251 offenses, there has to be specific offense that the image created, that there's sufficient evidence for that conviction. And here we submit that the evidence for the conviction existed, but it existed in the Southern District of New York, not the Eastern District. To return finally, if the Court, thank you, Your Honor. I'm sensing it's an uphill battle here on the unconstitutional argument. But I would just like to highlight one point for the Court. At the end of the day, I sense the Court is agreeing with the government that, well, we just can't read 1591 to mean what it literally does. The problem is that the government has not identified an alternate construction of the statute, nor could it. Stevens sets out very clearly in a situation analogous to this one, where there was a law saying certain depictions are going to be illegal, and the government argued for a narrowing construction. They said, look, the point of this law is to get at animal cruelty. Let's read it in that context. Wounded and killed have to mean with cruelty. The Supreme Court said no. Wounded, the other words in the statute suggest cruelty, the Court said. But wounded and killed don't. We look at the plain text, and if we feel that the plain text applies in this situation, we leave it to Congress to rewrite the law. We don't say we're going to rewrite it ourselves. That's not our function. We leave it to Congress. We would ask the Court to do the same. Thank you very much. Well argued. We'll reserve decision.